IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

TINA MAE LOUISE PARKER,  )
    Plaintiff,  )
  )
v.  )
  )
  )    Civil No. 3:14cv502 (REP)
CAROLYN W. COLVIN,  )
Acting Commissioner of Social Security,  )
    Defendant.  )
  )

## REPORT AND RECOMMENDATION

Tina May Louise Parker ("Plaintiff") is fifty-two years old and previously worked part-time cutting pillows. On August 11, 2011, Plaintiff applied for Social Security Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), alleging disability since July 19, 2011. Plaintiff's claims were denied both initially and upon reconsideration. On March 6, 2013, Plaintiff (represented by counsel) testified during a hearing before an Administrative Law Judge ("ALJ"). On March 18, 2013, the ALJ subsequently denied Plaintiff's claims in a written decision. On May 13, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in determining that Plaintiff did not meet the requirements of medical listing § 1.04A, in assessing the opinion of Dr. Saleeby, in determining Plaintiff's Residual Function Capacity ("RFC"), in assessing Plaintiff's credibility, and that remand is warranted based on new evidence presented to the Appeals Council. (Pl.'s Mot. for Summ. J. or Alternatively, Pl.'s Mot. for Remand ("Pl.'s Mem.") (ECF No. 7) at 14-25.) Plaintiff further argues that the ALJ presented an

improper hypothetical to the vocational expert ("VE"). (Pl.'s Mem. in Resp. to Ct.'s Order Regarding *Mascio v. Colvin* and Reply to Def.'s Mem. ("Pl.'s Mem. in Light of *Mascio*") (ECF No. 15) at 2.) The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the entire record, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment or in the Alternative, Motion for Remand (ECF No. 7) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

### A.  Education and Work History

Plaintiff was fifty-two years old when she applied for DIB on August 11, 2011. (R. at 81, 177.) Plaintiff completed school through the ninth grade and received her GED. (R. at 45.) She attended Brown's Business School for receptionist training. (R. at 45.) Plaintiff has not worked since October 2008, when she worked part-time cutting pillows. (R. at 46.) Plaintiff's past work experience includes working as a Home Depot sales attendant, a packer at Jones Apparel, a spread cutter at Virginia Quilting, an associate school counselor and a veterinary assistant. (R. at 46-48.)

### B.  Medical Records

On June 9, 2010, Plaintiff saw Dr. Manhal Saleeby, M.D., pain management specialist, reporting shooting pain down her left leg and foot with numbness in her foot. (R. at 575.) Dr.

Saleesby had diagnosed Plaintiff with degenerative disc disease ("DDD") on June 26, 2008. (R. at 591.) She walked with an antalgic gait, limped and used a cane. (R. at 575.) A straight-leg raise test was positive on the left at thirty degrees and on the right with pain radiating to the Plaintiff's left leg. (R. at 575.) Dr. Saleeby noted sensory deficits in the distribution of L2, L3 and L4 on the left to pinprick and temperature tests. (R. at 575.)

On June 17, 2010, Plaintiff saw Dr. John Ward, M.D. (R. at 701.) Dr. Ward reported that Plaintiff's MRI showed workup and some lumbar stenosis at L4-L5. (R. at 701.) Plaintiff experienced severe back and leg pain, especially when she walked. (R. at 701.) She fell a few times and complained of numbness on her left leg. (R. at 701.) A physical examination revealed that Plaintiff had sensory loss in the L5 distribution on the left side. (R. at 701.) She maintained good strength in her quadriceps, dorsi and plantar flexion. (R. at 701.) A straight-leg raise test was negative. (R. at 701.) After reviewing Plaintiff's MRI, Dr. Ward opined that Plaintiff had "clear-cut" lumbar stenosis at L4-L5. (R. at 701.)

On November 22, 2010, Plaintiff returned to Dr. Saleeby for a follow-up visit, complaining of continued neck and lower back pain. (R. at 572.) Injections, procedures and physical therapy failed to improve her condition. (R. at 572.) Plaintiff rated her pain between a nine and a ten out of ten, but medications made her pain tolerable. (R. at 572.) A physical examination showed no new changes from the prior visit. (R. at 572.) Dr. Saleeby prescribed Oxycodone and Temazepem. (R. at 572.)

On January 10, 2011, Plaintiff returned to Dr. Saleeby with continued neck and lower back pain after slipping on ice. (R. at 570.) She showed no acute distress or acute pain behavior.

3

(R. at 570.) Plaintiff reported that medications made her pain tolerable and enabled her to perform activities around her house, such as cooking and laundry. (R. at 570.)

On March 11, 2011, Plaintiff saw Kevin Horne, F.N.P. (R. at 567.) A progress report from Nurse Horne rated Plaintiff's lower back pain a six out of ten for severity and a seven out of ten for intensity. (R. at 567.) Plaintiff rated her pain at that time a nine out of ten with a dull quality that radiated to her legs. (R. at 567.) She reported that her medications effectively relieved her pain, allowing her to shop, drive and perform self-care activities and light house cleaning. (R. at 567.) A physical examination revealed tenderness in the paraspinal muscles, especially on the left side. (R. at 568.) Plaintiff's straight-leg raise test returned negative results on both sides. (R. at 568.) Plaintiff had normal strength, tone and range of motion in her spine, as well as a normal range of motion in her upper and lower extremities. (R. at 568.) Her reflexes were 2+ bilaterally.[1] (R. at 568.) Plaintiff had a normal gait and did not use any assistive devices. (R. at 568.)

On August 1, 2011, Dr. Ward noted that Plaintiff walked with a limp and had a decreased range of motion. (R. at 504, 564.) Plaintiff reported back and leg pain when walking and that her medication did not improve her pain. (R. at 504.) Dr. Ward noted that Plaintiff's MRI from 2009 showed moderately significant stenosis at L4-L5 and that Plaintiff's panic attacks, vertigo and lower back pain prevented her from maintaining meaningful employment. (R. at 504.) Plaintiff's straight-leg raise test returned negative results. (R. at 504.) Plaintiff maintained good

---

[1]     2+ reflex findings are considered normal. Hal Blumenfeld, M.D., Ph.D., *Deep Tendon Reflexes*, Neuroanatomy through Clinical Cases, http://www.neuroexam.com/neuroexam/content. php?p=31 (last visited June 26, 2015).

strength in her quadriceps, dorsi and plantar flexion. (R. at 504.) Dr. Ward diagnosed Plaintiff with lumbar stenosis and recommended an MRI of her lumbar spine. (R. at 504.)

On September 13, 2011, Dr. Saleeby reviewed Plaintiff's MRI of the thoracic spine and lumbar spines. (R. at 558.) Plaintiff had mild multilevel DDD in the upper thoracic spine and mild to moderate multi-level DDD in the lower thoracic spine. (R. at 562.) In the lumbar spine, Dr. Saleeby noted moderate hyperlordosis, but no evidence existed of any marrow replacing process. (R. at 559.) At L5-S1, Dr. Saleeby found mild facit osteoarthritis, mild DDD, moderate hyperlordosis in the lumbar spine, mild asymmetric disc bulge left paracentrally, mild stenosis of left lateral recess, moderate stenosis of the left neutral foramen and mild to moderate stenosis on the right neutral foramen. (R. at 559.) At L4-L5, Dr. Saleeby found moderate to marked hypertrophic osteoarthritis, moderate DDD without herniation, mild central stenosis, mild left lateral stenosis and mild to moderate right lateral stenosis. (R. at 559.) There was mild multilevel DDD, without significant stenosis, in the rest of the lumbar spine. (R. at 560.)

On November 21, 2011, Plaintiff reported to Dr. Saleeby that she felt sharp and shooting pain in her neck and lower back that radiated to her right arm and both legs. (R. at 552.) Plaintiff rated her pain an eight out of ten. (R. at 552.) Plaintiff complained of constant pain. (R. at 552.) She reported that her medications did not have side effects and allowed her to remain fairly active around the house. (R. at 552.) Physical examination by Dr. Saleeby revealed tenderness in the paraspinal muscle in the cervical and lumbosacral spines. (R. at 553.) Plaintiff maintained a normal range of motion, muscle strength and tone in the cervical and lumbosacral spines. (R. at 553.) She had a normal gait. (R at 553.)

5

On January 20, 2012, Plaintiff returned to Nurse Horne, reporting pain in her lower back, neck, hips and legs. (R. at 732.) After falling on a porch, Plaintiff pulled her neck and experienced headaches. (R. at 732.) Plaintiff said that her pain was constant and rated a four out of ten, but said the pain averaged a six out of ten over the last month. (R. at 732.) Her medications allowed her to remain fairly active around the house. (R. at 732.) A physical examination showed continued tenderness in the lumbosacral spine and mild tenderness in the cervical spine. (R. at 733.) Plaintiff maintained normal range of motion, muscle strength and tone in the cervical and lumbar spines. (R. at 733.) Nurse Horne reported that Plaintiff had a normal gait and could stand without difficulty. (R. at 733.)

On April 11, 2012, Plaintiff returned to Dr. Saleeby for a follow-up visit and to complete disability papers. (R. at 735.) Plaintiff's pain rated an eight out of ten over the previous month. (R. at 735.) She experienced pain in her neck and lower back, radiating to her right arm and left leg. (R. at 735.) Dr. Saleeby noted that Plaintiff was unable to perform activities of daily living without her pain medications. (R. at 735.) Physical examination showed tenderness in the paraspinal muscle of the cervical and lumbosacral spine. (R. at 736.) Plaintiff had a restricted range of motion in the cervical and lumbosacral spines. (R. at 736.) Otherwise, Plaintiff maintained normal muscle strength and tone. (R. at 736.) Dr. Saleeby also noted an absence of muscle atrophy. (R. at 736.) Dr. Saleeby reported that Plaintiff had a normal gait, but was unsteady when standing and walked with a cane. (R. at 736-37.)

Dr. Saleeby also completed a Spinal Impairment Questionnaire. (R. at 751-57.) He gave Plaintiff a poor prognosis on returning to work. (R. at 751.) Dr. Saleeby supported this

6

prognosis with the following findings: a limited range of motion in the cervical spine to five degrees extension, fifteen degrees flexion and thirty degrees lateral rotation, and limited motion in the lumbar spine to twelve degrees extension and thirty degrees flexion. (R. at 751.) Plaintiff also had worsening tenderness in the cervical spine at C5-6 and in the left lumbar spine. (R. at 752.) She had abnormal reflexes, but no muscle atrophy. (R. at 752.) Plaintiff's straight-leg raise test was positive at thirty degrees on the left and forty-five degrees on the right. (R. at 752.) Plaintiff experienced muscle spasms, sensory loss, reflex changes, muscle weakness and walked with an abnormal gait using the assistance of a cane. (R. at 752.)

Dr. Saleeby opined that Plaintiff could sit for two hours and stand or walk for two hours. (R. at 754.) Plaintiff had to get up and walk around every fifteen minutes and take breaks from standing every fifteen minutes. (R. at 754.) Further, Plaintiff should not continuously stand or walk in a work environment. (R. at 754.) Plaintiff could occasionally lift or carry about five pounds. (R. at 755.) Dr. Saleeby believed that Plaintiff's pain was severe enough to constantly interfere with her attention and concentration. (R. at 755.) Additionally, Plaintiff could not keep her neck in a constant position. (R. at 756.) Dr. Saleeby also opined that Plaintiff would likely have good days and bad days, and would miss work more than three times per month due to her impairments and treatment. (R. at 756.)

Dr. Saleeby cited several additional limitations affecting Plaintiff's ability to work at a regular job on a sustained basis, including psychological limitations, limited vision and a need to avoid noise, fumes, gases, temperature extremes, humidity and dust. (R. at 757.) Plaintiff could not push, pull, kneel, bend or stoop. (R. at 757.) Accordingly, Dr. Saleeby concluded that

7

Plaintiff could not even tolerate "low stress" from work and could not maintain a full-time, competitive job requiring activity on a sustained basis. (R. at 756.) Lastly, on April 11, 2012, Dr. Saleeby wrote a "To Whom it May Concern" letter, explaining that Plaintiff suffered from chronic pain related to post-laminectomy pain, cervical and lumbar radiculopathy, DDD and facet arthroscopy. (R. at 680.) The letter noted that Plaintiff was unable to work in any capacity and that she was on a chronic low dose narcotic. (R. at 680.)

On a July 9, 2012, Plaintiff reported to Nurse Horne having pain in her lower back, neck and both hips. (R. at 738.) She rated the pain as an eight out of ten, describing it as a constant ache that radiated to the right arm and both legs. (R. at 738.) A physical examination showed moderate tenderness in Plaintiff's lumbosacral spine and moderate tenderness to palpation of the left hip. (R. at 739.) She maintained a normal range of motion in the spine and hips. (R. at 739.) Nurse Horne noted that Plaintiff had a normal gait and could stand without difficulty. (R. at 739.) Nurse Horne reported that Plaintiff coped well on her medications and that they improved her daily functioning. (R. at 738.) Plaintiff continued to take Oxycodone. (R. at 739.)

On September 10, 2012, Plaintiff returned to Dr. Ward, complaining of chronic back and leg pain. (R. at 715.) She also complained of pain in her wrists and hands, as well as aching arms. (R. at 715.) Plaintiff had a difficulty standing and sitting for prolonged periods and trouble holding things because of weakness and pain in her hands. (R. at 715.) A physical examination revealed that Plaintiff had a decent range of motion in her neck and good strength in her deltoid, biceps and triceps. (R. at 715.) Dr. Ward noted that Plaintiff had some weakness in

8

her hands and grip, probably due to joint pain. (R. at 715.) Plaintiff had a normal gait, station and reflexes. (R. at 715.)

On October 24, 2012, Dr. Ward reviewed an MRI of Plaintiff's cervical spine, finding osteophytosis at C3-C4 and C4-C5. (R. at 689.) Dr. Ward noted evidence of anterior spinal body fusion at C6-C7 and mild DDD at C2-C3 with minimal central stenosis. (R. at 690.) At C3-C4, Dr. Ward noted moderate DDD with small central disc protrusion, impression to ventral aspect of spinal cord, mild central stenosis and moderate lateral stenosis bilaterally, more pronounced on the right side. (R. at 690.) He observed moderate to severe DDD at C4-C5 with mild to moderate facet osteoarthritis bilaterally, moderate central stenosis, moderate left lateral stenosis and severe right lateral stenosis, moderate DDD at C5-C6 without disc herniation with mild central stenosis, and mild DDD at C7-T1. (R. at 690.)

On November 5, 2012, Plaintiff returned to Dr. Ward, reporting continued pain in her lower back, neck and left leg. (R. at 721.) Dr. Ward noted that physical therapy did not improve her condition. (R. at 721.) A physical examination revealed that Plaintiff walked with a slight limp and that she took time getting out of a chair due to back pain. (R. at 721.) Plaintiff also experienced pain in her left shoulder with manipulation of her left arm. (R. at 721.) A straight-leg raise test returned negative results. (R. at 721.) Dr. Ward reported that individual muscle strength was good. (R. at 721.) Dr. Ward also reviewed Plaintiff's MRI and diagnosed Plaintiff with chronic pain in her back, leg and neck resulting from cervical spondylosis and moderate spondylosis in her lumbar spine. (R. at 721.) Dr. Ward noted that Plaintiff ached all over in her arms, legs, hips, neck and back. (R. at 721.)

9

On January 3, 2013, Plaintiff visited Dr. Saleeby for lower back and neck pain that radiated to her right arm and left leg. (R. at 744.) Plaintiff rated her pain as an eight out of ten. (R. at 744.) Plaintiff's medications allowed her to remain active around the house performing daily tasks. (R. at 744.) A physical examination revealed tenderness in the paraspinal muscle in the cervical spine. (R. at 745.) Plaintiff wore clamshell braces on her lumbosacral spine. (R. at 745.) There was no tenderness in the lumbosacral spine. (R. at 745.) Plaintiff had a normal gait with a normal range of motion in the cervical and lumbar spines. (R. at 745.)

On July 25, 2013, Plaintiff visited Dr. Josephus Bloem, M.D., orthopedic surgeon. (R. at 769.) Plaintiff explained the history of her symptoms and complained of migraines, as well as pain in the neck and lower back. (R. at 769.) Plaintiff used a cane for balance due to her vertigo. (R. at 769.) Dr. Bloem also observed that Plaintiff had difficulty with toe and heel walking and a limited range of motion of the back. (R. at 770.) Plaintiff could bend forward and backwards only a few degrees due to pain in the lower lumbar area. (R. at 770.) Dr. Bloem noted atrophy of the quadriceps on the left when Plaintiff sat down. (R. at 770.) Plaintiff could not sit or stand for long periods of time without trouble. (R. at 770.) She experienced pain to palpation in the upper lumbar area from L2 to about T9. (R. at 770.) Plaintiff's neck rotation was limited to sixty degrees to the left and fifty degrees to the right. (R. at 770.) Plaintiff's straight-leg raise test was normal. (R. at 770.)

Dr. Bloem also reviewed Plaintiff's MRIs from September 2011 and October 2012. (R. at 770.) He found multiple-level DDD and osteophytes in Plaintiff's neck and bulging in the lumbosacral spine with mild lateral recess stenosis at L4-L5. (R. at 770.) Dr. Bloem believed

10

that Plaintiff's symptoms were mostly consistent with his findings, but Plaintiff may have exaggerated her presentation. (R. at 770.) Dr. Bloem attributed the weakness that Plaintiff described when walking to her notable quadriceps atrophy. (R. at 770.) Dr. Bloem diagnosed Plaintiff with a history of migraine and vertigo, low back pain with bilateral radiation, left quadriceps atrophy, neck pain and tardy ulnar nerve palsy[2] in the arms. (R. at 771.) He opined that Plaintiff's condition would last more than twelve months and that she was unable to perform normal work in a competitive work setting. (R. at 771.) He suggested that Plaintiff might benefit from a neurological evaluation of the nerves in the lower extremities. (R. at 771.)

On July 25, 2013, Dr. Bloem also completed a Multiple Impairment Questionnaire. (R. at 772-79.) He gave Plaintiff a "poor" prognosis and referenced his written report to describe Plaintiff's laboratory and diagnostic test results, primary symptoms and other details about Plaintiff's pain. (R. at 772-74.) Dr. Bloem agreed that Plaintiff's symptoms were reasonably consistent with Plaintiff's physical and emotional impairments. (R. at 773.) On a ten-point scale, Dr. Bloem rated Plaintiff's pain between six and seven in the moderate to moderately severe range, and her fatigue rated between four and five in the moderate range. (R. at 774.)

Dr. Bloem opined that Plaintiff could sit for two hours and stand or walk for two hours in an eight-hour work day, that she could frequently carry or lift five pounds and occasionally carry or lift between five and ten pounds. (R. at 774-75.) Dr. Bloem noted that Plaintiff experienced limitations in doing repetitive reaching, handling, fingering or lifting, and was essentially

---

[2]     Ulnar nerve palsy is a condition that results in the loss of sensation in the fingers. Rachel Nall, *Ulnar Nerve Palsy (Dysfunction)*, Healthline (July 20, 2012), http://www.healthline.com/health/ulnar-nerve-dysfunction#Overview1.

precluded from using her upper extremities to grasp, turn or twist objects. (R. at 775.) Plaintiff was also limited in using her hands and fingers for fine manipulations and using her arms for reaching. (R. at 776.) According to Dr. Bloem, Plaintiff's symptoms would likely increase if she were placed in a competitive work environment and would interfere with her ability to keep her neck in a constant position. (R. at 776.)

Further, Dr. Bloem opined that Plaintiff was unable to perform full-time competitive work and that her symptoms would frequently interfere with her attention and concentration. (R. at 777.) He confirmed that her impairments would last at least twelve months and that emotional factors contributed to Plaintiff's functional limitations. (R. at 777.) Dr. Bloem opined that Plaintiff was capable of low stress work and that she would frequently need to take unscheduled breaks to rest at unpredictable intervals during an eight-hour work day. (R. at 777.) Dr. Bloem estimated that Plaintiff's impairments would likely produce good and bad days and cause her to miss work more than three times per month. (R. at 778.)

C.  State Agency Physicians

On September 6, 2011, David Williams, M.D., a state agency consultant, completed an RFC assessment. (R. at 86-90.) Based on his review of Plaintiff's records, Dr. Williams opined that Plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. (R. at 86.) Plaintiff could stand or walk for about six hours and sit for about six hours in an eight-hour work day with normal breaks. (R. at 86). Dr. Williams noted that Plaintiff had postural limitations and that she could never climb ladders, ropes or scaffolds. (R. at 87.) Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl. (R. at

87.) Dr. Williams opined that Plaintiff was not disabled. (R. at 90.) He explained that Plaintiff had some limitations to perform work related activities. (R. at 90.) Although Plaintiff could not perform some of her past work, her condition was not so severe that she could not perform any work. (R. at 90.)

On December 1, 2011, James Wickham, M.D., a state agency consultant, reconsidered Plaintiff's file. (R. at 99-103.) Dr. Wickham completed an RFC assessment and found the same limitations as Dr. Williams. (R. at 99-100.) Dr. Wickham also determined that Plaintiff was not disabled. (R. at 102.)

D. Function Reports

On August 27, 2011, Plaintiff completed a Function Report. (R. at 283-290.) Plaintiff reported that she lived with her husband in a house. (R. at 283.) Her morning activity consisted of waking up, eating breakfast and watching the news. (R. at 283.) Plaintiff reported that she needed to alternate between sitting and standing about every ten minutes. (R. at 283.) She tried to wash dishes, but could not stand for long. (R. at 283.) Plaintiff also tried to fold clothes while she sat on her bed. (R. at 283.) During the day, Plaintiff ate a sandwich, took a nap, watched television and read until her husband came home and made dinner. (R. at 283.) At night, Plaintiff took a shower and then took her medications for sleep, pain, cholesterol and anxiety. (R. at 283.) She watched television until she fell asleep. (R. at 283.)

Before her alleged disability, Plaintiff could lift, take long walks, work eight hours per day, take care of her animals, garden and clean her house. (R. at 284.) She can no longer perform those tasks. (R. at 284.) Plaintiff had trouble putting shirts on over her head and tying

13

shoes because she cannot bend. (R. at 284.) Plaintiff reported that she needed reminders from her husband to take her medications and that her husband prepared meals. (R. at 285.) However, Plaintiff prepared herself cereal for breakfast and a sandwich for lunch. (R. at 285.) Plaintiff wrote that she no longer performed household chores indoors or outside, because she was unable to bend, stoop, sit or stand for long periods of time. (R. at 285-86.) She sometimes went outside. (R. at 286.) Plaintiff did not drive, because her vertigo caused dizzy spells. (R. at 286.) However, she rode in a car with others to go grocery shopping every two weeks for about one hour. (R. at 286.) Plaintiff used a cane when walking and a wheelchair in stores. (R. at 289.)

Plaintiff's hobbies included reading and watching television daily. (R. at 287.) She talked to her sisters on the phone about twice per week. (R. at 287.) Plaintiff indicated that her injury affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, concentrate, understand, follow instructions, use her hands and get along with others. (R. at 288.) Her injuries limited her to lifting about three pounds, standing for about ten minutes at a time and walking about twelve feet before needing to stop and rest. (R. at 288.) Plaintiff remarked that her lack of income and inability to work sometimes caused her to miss doctor appointments, which exacerbated her pain and anxiety. (R. at 290.)

On August 27, 2011, Plaintiff also completed a Pain Questionnaire. (R. at 280-81.) Plaintiff reported pain in the lower and middle back, neck pain that radiated to her right arm, shooting pain from her right to left leg down the back and pain in her left hip. (R. at 280.) Medications helped some, but Plaintiff claimed that she required more due to constant pain. (R.

14

at 280.) Moving the wrong way, walking, standing or sitting for too long and sleeping in the wrong position each worsened Plaintiff's pain. (R. at 280.)

E. Plaintiff's Testimony

On March 6, 2013, Plaintiff (represented by counsel) testified during a hearing before the ALJ. (R. at 38-62.) Plaintiff was fifty-four years old. (R. at 43.) She completed school through the ninth grade and received a GED. (R. at 45.) Plaintiff could read, write and solve simple math problems. (R. at 45.)

Plaintiff attended Brown's Business School for receptionist training. (R. at 45.) She testified that she had no income and that her husband supported her. (R. at 45.) Plaintiff was last employed in October of 2008, when she worked part-time cutting pillows. (R. at 46.) Plaintiff's past work experience included working as a Home Depot sales attendant, a packer at Jones Apparel, a spread cutter at Virginia Quilting, an associate school counselor and as a veterinary assistant. (R. at 46-48.)

Plaintiff testified that she could not work, because she cannot sit or stand for long periods of the time. (R. at 49-50.) Her vertigo prevented her from driving. (R. at 50.) She often felt tired, had trouble concentrating, and she experienced a lot of pain. (R. at 50.) Plaintiff reported experiencing constant pain in her back, legs, hands and neck. (R. at 50.) During the hearing, Plaintiff rated her pain as a ten out of ten without medications and about a seven out of ten after she takes her medications. (R. at 50.) Plaintiff stated that Amitriptyline helped her sleep at night, while oxycodone and hydrocodone helped with pain management. (R. at 51.) Plaintiff testified that she could sit comfortably for about ten minutes and stand for five to seven minutes.

15

(R. at 52.) She no longer did dishes. (R. at 52.) Although Plaintiff used a cane to stand, Plaintiff's doctors did not prescribe a cane. (R. at 52.) Plaintiff testified that she was unable to lift six pounds. (R. at 52.) To help alleviate her pain, Plaintiff laid down for half an hour about every two hours. (R. at 53.)

Plaintiff stated that her pain worsened when she bent or reached, raised her legs and sat or stood for long periods of time. (R. at 53.) She could not tie her shoes. (R. at 53.) She showered in the evening with the help of her husband. (R. at 54.) Plaintiff testified that she did not cook, wash dishes, perform housework, do laundry or drive. (R. at 55.) Plaintiff had not driven for three years because of her vertigo. (R. at 56.) Plaintiff watched television for two hours per day and used the computer once every two weeks to check emails. (R. at 57.) She had not walked her dogs for four years. (R. at 58.) Plaintiff reported that her daughters picked her up once per week to visit her grandchildren. (R. at 59.) She also went to the store once every two weeks with one of her daughters. (R. at 59.) To manage her pain, Plaintiff had injections in her spine, but the relief did not last for more than six months. (R. at 60.)

G. Vocational Expert Testimony

An impartial VE testified at the hearing. (R. at 62.) In response to hypotheticals posed by the ALJ, the VE testified that Plaintiff could not perform her past work. (R. at 65-66.) The ALJ inquired about what types of work could be performed by an individual who could occasionally carry or lift up to twenty pounds, frequently lift or carry up to ten pounds, was able to stand or walk for six hours and sit for six hours in an eight-hour day. (R. at 65-66.) The individual could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl,

16

but never climb ladders, ropes or scaffolds. (R. at 66.) Additionally, the individual must avoid concentrative exposure to hazards, including machinery and heights. (R. at 66.) Finally, the individual would be limited to simple and repetitive tasks with a specific vocational preparation code of no more than two in a non-production oriented work setting, with no public interaction and limited interaction with co-workers and supervisors. (R. at 66.)

The VE responded that an individual with such limitations could work as a marker, with 141,000 jobs available nationally, a non-governmental mail clerk, with 128,000 jobs available nationally, or a conveyor line bakery worker, with 57,500 jobs available nationally. (R. at 67.) The VE testified that an individual needing to alternate between sitting and standing could still work as a mail clerk, a bakery worker or an assembler, but was precluded from working as a marker. (R. at 71-72.) The VE said that an individual was precluded from all light work if they used a cane for ambulation and assistance. (R. at 68.)

## II. PROCEDURAL HISTORY

On August 11, 2011, Plaintiff applied for DIB with an alleged onset date of July 19, 2011. (R. at 177.) This claim was denied both initially and on reconsideration. (R. at 105-15.) Plaintiff next filed a request for a hearing on January 12, 2012, and the ALJ held a hearing on March 6, 2013, during which Plaintiff (represented by counsel) and a VE testified. (R. at 36-75, 118-119.) On March 18, 2013, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff was not disabled under the Act, because Plaintiff could perform other work that existed in the national economy. (R. at 17-27.) On May 13, 2014, the Appeals

Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of

the Commissioner subject to judicial review by this Court. (R. at 1.)

## III. QUESTIONS PRESENTED

1. Did the ALJ err in in determining that Plaintiff did not meet the requirements of medical listing § 1.04A?
2. Did the ALJ err in the weight afforded to Dr. Saleeby's opinion?
3. Did the ALJ err in assessing Plaintiff's credibility?
4. Did the ALJ err in determining Plaintiff's RFC?
5. Did the ALJ present a proper hypothetical to the VE?
6. Is remand warranted based on new evidence presented to the Appeals Council?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether substantial evidence in the record supports the Commissioner's decision and

whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue,*

667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th

Cir.2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the

kind of relevant evidence that a reasonable mind could accept as adequate to support a

conclusion. *Hancock,* 667 F.3d at 472; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir.1996).

To determine whether substantial evidence exists, the Court must examine the record as a

whole, but may not "'undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock,* 667 F.3d at 472

(quoting *Johnson,* 434 F.3d at 653). In considering the decision of the Commissioner based on

the record as a whole, the Court must "'take into account whatever in the record fairly detracts

from its weight.'" *Breeden v. Weinberger,* 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir.2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176–77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial

19

gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to her past relevant work[3] based on an assessment of the claimant's RFC[4] and the "physical and mental demands of work [the claimant] has done in

---

[3]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[4]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR–96–8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

20

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n. 5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir.1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V. ANALYSIS

A. The ALJ's Decision

On March 6, 2013, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 36-75.) On March 18, 2013, the ALJ issued an opinion finding that Plaintiff was not disabled under the Act. (R. at 17-27.) The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. at 18-19.)

At step one, the ALJ found that Plaintiff had not engaged in SGA since the alleged onset date. (R. at 19.) At step two, the ALJ determined that Plaintiff suffered severe impairments of DDD of the spine, vertigo, obesity, depression and anxiety. (R. at 19.) At step three, the ALJ held that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.)

Additionally, the ALJ found that Plaintiff maintained RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with certain limitations. (R. at 21.) Plaintiff could never climb ladders, ropes or scaffolds. (R. at 21.) She could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 21.) Plaintiff should avoid concentrated exposure to hazardous machinery and heights. She could alternate between sitting and standing in place every half-hour. (R. at 21.) Plaintiff could perform only unskilled work with a specific vocational preparation code of no more than two in a non-production oriented work setting. (R.

22

at 21.) Lastly, Plaintiff could not interact with the public and could only tolerate occasional interaction with co-workers and supervisors. (R. at 21.)

At step four, the ALJ determined that Plaintiff could not perform her past relevant work. (R. at 25.) At step five, based upon Plaintiff's age, education, work experience and RFC, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 26.) Specifically, the ALJ found that Plaintiff, regardless of her limitations, could work as a mail clerk, a bakery conveyor line worker or an assembler. (R. at 26.) Therefore, Plaintiff was not disabled under the Act. (R. at 27.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred: (1) in determining that Plaintiff is not disabled under medical listing § 1.04A, (2) in affording no weight to Dr. Saleeby's opinion, (3) in assessing Plaintiff's credibility, (4) in determining Plaintiff's RFC, (5) in presenting a flawed hypothetical to the VE, and (6) in evaluating new evidence before the Appeals Council. (Pl.'s Mem. at 14-25; Pl.'s Mem. in Light of *Mascio* at 2.)

B. The ALJ did not err in determining that Plaintiff did not meet the requirements of listing § 1.04A.

Plaintiff argues that the ALJ erred in finding that Plaintiff's condition did not meet listing § 1.04A for a physical disability, because the ALJ misrepresented the record and failed to cite to medical evidence supporting her conclusion. (Pl.'s Mem. at 14-15.) Defendant maintains that substantial evidence supports the ALJ's determination. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 11) at 16-20.)

Plaintiff bears the burden of proving that she meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes

23

further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

To meet listing § 1.04A, Plaintiff's condition must satisfy all of the listing's enumerated criteria. *Zebley*, 493 U.S. at 530. Specifically, Plaintiff in this case must demonstrate:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raise test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A.

In this case, the ALJ determined that Plaintiff had the severe impairments of DDD of the spine, vertigo, obesity, depression and anxiety. (R. at 19.) However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 20.) Substantial evidence supports the ALJ's decision.

Plaintiff's medical records support the ALJ's determination. On March 11, 2011, Nurse Horne's physical examination showed that Plaintiff had a normal range of motion, muscle strength and tone in her spine, as well as a normal range of motion in her upper and lower extremities. (R. at 568.) In March and June 2011, Nurse Horne noted that Plaintiff had a normal gait, normal reflexes, and negative straight-leg test results bilaterally. (R. at 564, 568.)

24

On August 1, 2011, Dr. Ward noted that Plaintiff maintained good strength in her quadriceps, dorsi and plantar flexion. (R. at 504.) Plaintiff's straight-leg raise test returned negative results. (R. at 504.) On November 21, 2011, Dr. Saleeby's physical examination revealed that Plaintiff had a normal gait with a normal range of motion, muscle strength and tone in the cervical and lumbar spines. (R. at 553.)

On January 20, 2012, Nurse Horne's physical examination showed that Plaintiff maintained a normal range of motion in the cervical and lumbar spines, as well as normal muscle strength and tone. (R. at 733.) Plaintiff also had a normal gait and could stand without difficulty. (R. at 733.) On April 11, 2012, Dr. Saleeby's physical examination showed that Plaintiff maintained normal muscle strength and tone in the cervical and lumbar spines. (R. at 736.) Dr. Saleeby also noted an absence of muscle atrophy. (R. at 736.) Plaintiff's straight-leg raise test returned positive results, but Dr. Saleeby did not specify whether he performed the test in both supine and sitting positions. (R. a 736.) On April 11, 2012, Dr. Saleeby again noted that Plaintiff had no muscle atrophy in a Spinal Impairment Questionnaire. (R. at 752.) On July 9, 2012, Nurse Horne's physical examination revealed that Plaintiff maintained a normal range of spinal motion. (R. at 739.) Nurse Horne also noted that Plaintiff had a normal gait and could stand without difficulty. (R. at 739.)

On September 10, 2012, Dr. Ward reported that Plaintiff retained good strength in her deltoid, biceps and triceps. (R. at 715.) Dr. Ward also noted that Plaintiff had a normal gait and station, as well as normal reflexes. (R. at 715.) On November 5, 2012, Dr. Ward's physical examination revealed that Plaintiff had good individual muscle strength. (R. at 721.) Plaintiff's

25

straight-leg raise test returned negative results. (R. at 721.) Finally, on January 3, 2013, Dr. Saleeby noted that Plaintiff had a normal gait. (R. at 745.)

Because the evidence considered by the ALJ does not demonstrate a limitation of motion of the spine, atrophy with associated muscle weakness or muscle weakness, reflex loss, positive straight-leg raise test results in the supine and sitting positions or chronic nonradicular pain and weakness resulting in the inability to ambulate effectively, substantial evidence supports the ALJ's decision.

C. The ALJ did not err in assessing the opinions of Dr. Saleeby.

Next, Plaintiff argues that the ALJ erred in affording Dr. Saleeby's opinion no weight. (Pl.'s Mem. at 15-21.) Defendant maintains that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 20-23.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must

26

evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (c).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. 20 C.F.R. §§ 404.1527(a), 416.913(a). The regulations also provide for the consideration of opinions from "other sources," including nurse practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[5] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig,* 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.,* when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency

---

[5]    The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

27

between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ – not the treating source – with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(l), 416.927(d)(l). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

Here, the ALJ gave no treating source controlling weight and had to reconcile opinions from Dr. Saleeby and other sources. (R. at 25.) On April 11, 2012, Dr. Saleeby gave Plaintiff a poor prognosis on returning to work, supported by his findings that Plaintiff had a limited range of motion in the cervical and lumbar spines, worsening tenderness in the cervical spine, abnormal reflexes, positive straight-leg raise tests, muscle spasms, sensory loss, reflex changes and muscle weakness. (R. at 751-52.) He also noted that Plaintiff walked with an abnormal gait using a cane. (R. at 752.)

In April of 2012, Dr. Saleeby wrote a "To Whom it May Concern" letter, claiming that Plaintiff could not work in any capacity due to chronic pain related to post laminectomy pain, cervical and lumbar radiculopathy, DDD and facet arthroscopy. (R. at 680.) Dr. Saleeby also completed a Spinal Impairment Questionnaire in which he opined that Plaintiff could sit for two hours and stand or walk for two hours. (R. at 751-55.) Plaintiff could not continuously stand or walk in a work environment and could occasionally lift or carry about five pounds. (R. at 751-55.) Dr. Saleeby noted that the severity of Plaintiff's pain would constantly interfere with her

attention and concentration. (R. at 755-56.) Plaintiff would likely miss work more than three times per month because of her alleged impairments. (R. at 755-56.) Thus, Dr. Saleeby concluded that Plaintiff could neither tolerate even "low stress" work nor maintain full-time competitive employment. (R. at 756.) Ultimately, the ALJ afforded Dr. Saleeby's opinions no weight, because his opinions were inconsistent with his own treatment notes and not supported by the objective evidence of the record. (R. at 25.) Substantial evidence supports the ALJ's decision.

Dr. Saleeby's opinions are inconsistent with his treatment notes from 2010 through 2013. On August 31, 2010, Plaintiff reported to Dr. Saleeby that her medications allowed her to remain fairly active around the house performing daily tasks. (R. at 555.) Dr. Saleeby's physical examination showed that Plaintiff had normal reflexes, as well as a normal range of motion, muscle strength and tone in her cervical, thoracic and lumbar spines. (R. at 556-57.) Dr. Saleeby noted that Plaintiff stood without difficulty. (R. at 557.)

On September 13, 2011, Dr. Saleeby's review of Plaintiff's MRI revealed no evidence of any marrow replacing abnormal process in the thoracic or lumbar spine or any significant scoliosis or kyphosis in the thoracic spine. (R. at 558-59.) On November 21, 2011, Dr. Saleeby's physical examination showed that Plaintiff had a normal gait, a normal range of motion, muscle strength and tone in the cervical and lumbar spines. (R. at 553.)

On April 11, 2012, Dr. Saleeby's physical examination showed no evidence of muscle atrophy. Plaintiff maintained normal muscle strength and tone in the cervical and lumbar spines. (R. at 736.) On January 3, 2013, Plaintiff reported to Dr. Saleeby that her medications allowed

29

her to remain fairly active around the house. (R. at 744.) Dr. Saleeby's physical examination showed that Plaintiff experienced no tenderness in the lumbar spine. (R. at 745.)  Plaintiff had a normal range of motion, muscle strength and tone in the cervical and lumbar spines, and she walked with a normal gait. (R. at 745.)

Substantial evidence also supports the ALJ's decision, because Dr. Saleeby's opinions stand contrary to the objective evidence in the record. On June 17, 2010, Dr. Ward noted that Plaintiff's straight-leg raise test returned negative results. (R. 701.) In June and November 2010, Plaintiff's physical examination revealed that she had largely normal strength in her quadriceps, dorsi and plantar flexion. (R. at 506, 701.)

In March and June 2011, Nurse Horne opined that Plaintiff retained normal reflexes, a normal gait and a normal range of motion, muscle strength and tone in spine. (R. at 564, 568.) Plaintiff also reported to Nurse Horne that her medications allowed her to remain fairly active around the house and perform self-care activities. (R. at 563, 567.) In March, June and August 2011, Nurse Horne and Dr. Ward noted that Plaintiff's straight-leg raise test returned negative results. (R. at 504, 564, 568.) On August 1, 2011, Dr. Ward's physical examination revealed that Plaintiff maintained good strength in her quadriceps, dorsi and plantar flexion. (R. at 504.)

On January 20, 2012, Plaintiff reported to Nurse Horne that her medications allowed her to remain fairly active around the house. (R. at 732.) Nurse Horne's physical examination showed that Plaintiff had a normal range of motion, muscle strength and tone in the cervical and lumbar spines. (R. at 733.) In January and July 2012, Plaintiff had a normal gait and could stand without difficulty. (R. at 733, 739.) On July 9, 2012, Nurse Horne's physical examination

showed that Plaintiff maintained a normal range of motion in the spine and hips. (R. at 739.) Nurse Horne noted that Plaintiff coped well on her medications, which improved her daily functioning. (R. at 738.) On September 10, 2012, Dr. Ward's physical examination revealed that Plaintiff had a decent range of motion in her neck and good strength in her deltoid, biceps and triceps. (R. at 715.) Dr. Ward also noted that Plaintiff had a normal gait and normal reflexes. (R. at 715.) On October 12, 2012, Nurse Horne noted that Plaintiff maintained a normal range in the cervical and lumbar spines, walked normally and could stand without difficulty. (R. at 742.) On November 5, 2012, Dr. Ward reported that Plaintiff had good individual muscle strength and negative straight-leg raise test results. (R. at 721.)

Based on inconsistencies between Dr. Saleeby's opinions, his treatment notes and the objective evidence in the record, substantial evidence supports the ALJ's decision to afford no weight to Dr. Saleeby's opinions.

D. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, because the ALJ mischaracterized Plaintiff's treatment as "conservative," inappropriately focused on findings from clinical examinations in the record and attempted to create inconsistencies between Plaintiff's testimony and the record. (Pl.'s Mem. at 22-23.) Defendant maintains substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 25.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-9f), 416.945(a)(1). The RFC must incorporate impairments supported by

31

the objective medical evidence in the record and those impairments that are based on the

claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must

follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. § 416.929(a).

The first step is to determine whether there is an underlying medically determinable physical or

mental impairment or combination of impairments that reasonably could produce the

individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must consider all of

the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5 n.3; *see also* SSR

96-8p at 13 ("[The] RFC assessment must be based on all of the relevant medical evidence in the

record."). If the underlying impairment reasonably could be expected to produce the individual's

pain, then the second part of the analysis requires the ALJ to evaluate the claimant's statements

about the intensity and persistence of the pain and the extent to which it affects the individual's

ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the

available evidence," including a determination of the credibility of the claimant's statements

regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight

given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco,

Inc. v. N.LR.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that

"[w]hen factual findings rest upon credibility determinations, they should be accepted by the

reviewing court absent exceptional circumstances." *Id.* (quoting *N.LR.B. v. Air Prods. &

Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)) (internal quotation marks omitted). Therefore,

this Court must accept the ALJ's factual findings and credibility determinations unless "a

32

credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (quoting *N.LR.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)) (internal quotation marks omitted). Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects were not entirely credible. (R. at 23.) On March 26, 2013, Plaintiff testified that she could not work, because she could not sit or stand for long periods of time, could not drive due to her vertigo, often felt tired, had trouble concentrating and experienced a lot of pain. (R. at 49-50.) Plaintiff used a cane to stand, although no doctor prescribed one. (R. at 52.) Plaintiff also testified that she could sit comfortably for about ten minutes, could stand for five to seven minutes and could not lift six pounds. (R. at 52-53.) Plaintiff stated that she did not cook, wash dishes, perform housework or drive. (R. at 55-56.) Ultimately, the ALJ diminished Plaintiff's credibility based on the conservative nature of Plaintiff's medical care, limited objective medical findings and Plaintiff's admissions regarding her level of activity. (R. at 22-25.) Substantial evidence supports the ALJ's decision.

33

Plaintiff's medical records support the ALJ's determination of Plaintiff's credibility. The ALJ may consider the conservative nature of Plaintiff's treatment in concert with the factors listed in 20 C.F.R. § 404.1529(c)(3)(iv)-(v), such as the effectiveness and side effects of any medications that Plaintiff took or treatment that Plaintiff pursued to relieve her pain. *Dunn v. Colvin*, __F. App'x__, 2015 WL 3451568, at *9 (4th Cir. March 25, 2015) (unpublished). The Fourth Circuit has described treatment as "conservative" in instances when a claimant's symptoms responded to or could be reasonably controlled by medications, or where a claimant's symptoms did not require hospitalization. *Id.* (citing *Gross v. Heckler*, 785 F.2d 1163, 1165-66 (4th Cir. 1986), *Shively v. Heckler*, 739 F.2d 987, 990 (4th Cir. 1984)). Plaintiff's treatment history in this case meets such definition of "conservative."

Since 2009, Plaintiff did not undergo any surgical procedures or hospitalization. (R. at 570, 572.) In November 2010 and January 2011, Plaintiff reported to Dr. Saleeby that medications made her pain tolerable and enabled her to perform activities around the house, including cooking and doing laundry. (R. at 570, 572.) In March 2011 and June 2011, Plaintiff reported to Nurse Horne that her medications effectively relieved her pain, allowing her to remain fairly active around the house. (R. at 563, 567.) In August 2011, November 2011 and January 2012, Plaintiff again reported to Dr. Saleeby that her medications had no side effects and allowed her to remain fairly active around the house. (R. at 552, 555.) On July 9, 2012, Nurse Horne noted that Plaintiff coped well with her medications, which improved her daily functioning. (R. at 739.) On January 3, 2013, Plaintiff stated to Dr. Saleeby that her medications allowed her to remain fairly active around the house performing daily tasks. (R. at 744.)

The limited objective medical findings corroborating Plaintiff's testimony supports the ALJ's decision to diminish Plaintiff's credibility. Between 2008 and 2013, Plaintiff repeatedly walked with a normal gait. (R. at 520, 564, 576, 577, 581, 715, 733, 739, 742, 745.) Plaintiff usually stood without difficulty. (R. at 556-57, 564, 568, 733, 739, 742.) Both x-rays and physical examination showed that Plaintiff's extension and flexion were normal. (R. at 508, 591.) During physical examinations, Plaintiff routinely exhibited a normal range of motion, muscle strength and tone in her spine. (R. at 556-57, 564, 568, 733, 742.) Plaintiff retained normal reflexes. (R. at 564, 568, 715.) Physical examinations also showed that Plaintiff maintained normal strength in her quadriceps, dorsi and plantar flexion. (R. at 504, 506, 701.) Additionally, Plaintiff demonstrated good individual muscle strength. (R. at 715, 721.) Plaintiff's straight-leg raise test frequently returned negative results. (R. at 504, 564, 568, 701.)

Notes from Dr. Saleeby and Nurse Horne throughout Plaintiff's treatment further support the ALJ's decision. On January 10, 2011, Dr. Saleeby reported that Plaintiff appeared in no acute distress or pain. (R. at 570.) On July 9, 2012, Nurse Horne reported that Plaintiff coped well on her medications, which improved her daily functioning. (R. at 738.)

Finally, Plaintiff's own statements support the ALJ's decision. Plaintiff frequently reported that her medications allowed her to remain fairly active around the house. (R. at 552, 555, 563, 732, 744.) Plaintiff's medications enabled her to perform self-care activities, cook, do laundry, shop and drive. (R. at 567, 570.) Plaintiff stated in her Function Report that she tried to wash dishes and fold clothes while sitting. (R. at 283.) Plaintiff prepared breakfast and lunch for herself. (R. at 285.) Therefore, substantial evidence supports the ALJ's decision.

35

E. The ALJ did not pose a flawed hypothetical to the VE.

Plaintiff argues that the ALJ erred by failing to take into account Plaintiff's limitations in concentration, persistence and pace when the ALJ posed a hypothetical to the VE. (Pl.'s Mem. in Light of *Mascio* at 2.) Defendant maintains that the ALJ's hypothetical properly accounted for Plaintiff's moderate limitations in concentration, persistence and pace, because the hypothetical included additional restrictions beyond simple, unskilled work. (Def.'s Reply to Pl.'s Mem. in Light of *Mascio v. Colvin*) (ECF No. 16 at 1-2.)

1. The ALJ did not err in determining Plaintiff's RFC.

Plaintiff argues that the ALJ erred by failing to cite specific medical evidence that justified Plaintiff's RFC determination. (Pl.'s Mem. at 19-20.) Defendant maintains that the ALJ properly determined Plaintiff's RFC by considering the objective findings of Plaintiff's treating physicians, the state agency opinions and Plaintiff's testimony. (Def.'s Mem. at 23-24.)

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20. C.F.R. § 404.1545(b). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making her RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate

36

impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D.Va. June 23, 2011); 20 C.F.R. § 404.1545(e).

In this case, after considering all of Plaintiff's physical and mental impairments, the ALJ held that Plaintiff maintained the RFC to perform light work as defined in 20 CFR 404.1567(b), except that she should never climb ladders, ropes or scaffolds due to the combination of her impairments. (R. at 21.) Plaintiff should also avoid concentrated exposure to hazardous machinery and heights, and Plaintiff must be able to alternate between sitting and standing in place every half-hour. (R. at 21.) Plaintiff is capable of performing unskilled work with a specific vocational preparation code of no more than two in a non-production oriented work setting. (R. at 21.) Plaintiff should have no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 21.) The ALJ based her determination on the objective findings of the claimant's treating physicians, the assessments of state agency medical consultants and Plaintiff's own statements. (R. at 25.)

The objective findings of Plaintiff's treating physicians support the ALJ's determination. Dr. Ward and Dr. Saleeby repeatedly observed that Plaintiff had a normal gait. (R. at 520, 524, 564, 568, 576, 733, 739, 742, 744.) During physical examinations, Plaintiff frequently exhibited a normal range of motion, muscle strength and tone in the spine. (R. at 553, 556-57, 736, 739, 742.) Plaintiff maintained normal strength in her quadriceps, dorsi and plantar flexion. (R. at 504, 506, 701.) Both Dr. Ward and Dr. Saleeby also noted, on several occasions, that Plaintiff's medications improved her daily functioning and allowed her to remain fairly active around the

37

house. (R. at 555, 563, 732, 744.) Dr. Saleeby's notes reflect that Plaintiff's medications improved Plaintiff's pain and allowed her to perform self-care activities and light house cleaning, as well as cooking, laundry, driving and shopping. (R. at 567, 570, 572.)

State agency physicians' opinions further support the ALJ's RFC determination. On September 6, 2011, Dr. Williams opined that Plaintiff could occasionally lift or carry twenty pounds and frequently carry ten pounds. (R. at 86.) During an eight-hour workday with normal breaks, Plaintiff could stand or walk for about six hours and sit for about six hours. (R. at 86.) Dr. Williams opined that Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, but Plaintiff could never climb ladders, ropes or scaffolds. (R. at 87.) Dr. Williams concluded that although Plaintiff could not perform some of her past work, her condition did not totally preclude her from performing any work. (R. at 90.) On December 1, 2011, Dr. Wickham reconsidered Plaintiff's file and found the same limitations as Dr. Williams. (R. at 99-103.) Both Dr. Williams and Dr. Wickham concluded that Plaintiff was not disabled. (R. at 90, 102.)

Plaintiff's own statements support the ALJ's decision. On August 27, 2011, Plaintiff reported in a Function Report that she tried to wash dishes and fold clothes while sitting. (R. at 283.) During the day, Plaintiff watched television and read. (R. at 283.) Plaintiff also reported that she prepared breakfast and lunch for herself. (R. at 285.) On March 6, 2013, Plaintiff testified that she sometimes microwaved meals. (R. at 55.) Although Plaintiff's doctors did not prescribe it, Plaintiff used a cane to stand. (R. at 52.) Plaintiff also stated that she watched

television for two hours per day and used the computer once every two weeks to check email. (R. at 57.) Therefore, substantial evidence supports the ALJ's RFC determination.

2. The ALJ did not pose a flawed hypothetical to the VE.

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner can carry her burden in the final step with the testimony of a VE. As noted earlier, when a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

When addressing a claimant's mental limitations in concentration, persistence and pace, the ALJ's hypothetical question must take into account an individual's ability to stay on task, rather than being restricted to "simple, routine tasks or unskilled work." *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (citing *Winschel v. Comm'r of Soc Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (clarifying that only a hypothetical that addresses the ability to stay on task properly accounts for a claimant's limitations in concentration, persistence and pace).

39

At least two other district courts have held that a hypothetical addressing an individual limited to working in a non-production oriented environment properly addresses an individual's ability to stay on task. *See Linares v. Colvin*, 2015 WL 4389533, at *4 (W.D.N.C. July 17, 2015) (holding that a hypothetical limiting an individual to "simple repetitive, routine tasks in a stable work environment at non-production [*sic*] pace with only occasional public contact" accounted for the plaintiff's ability to stay on task); *Massey v. Colvin*, 2015 WL 3827574, at *7 (M.D.N.C. June 19, 2015) (distinguishing *Mascio* on the grounds that the ALJ's hypothetical included that the individual should work a non-production oriented job and, thus, accounted for the plaintiff's production pace); *but see Scruggs v. Colvin*, 2015 WL 2250890, at *6 (W.D.N.C. May 13, 2015) (remanding because the ALJ's hypothetical limiting an individual to simple, routine, repetitive tasks in a non-production environment does not address an individual's ability to stay on task).

In this case, the ALJ found that Plaintiff had moderate difficulties with regard to concentration, persistence and pace. (R. at 21.) When the ALJ posed the hypothetical to the VE, she asked what types of work could be performed by an individual who could occasionally carry or lift up to twenty pounds, frequently lift or carry up to ten pounds, was able to stand or walk for six hours in an eight-hour day and sit for six hours in an eight-hour day. (R. at 65-66.) The individual also could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 66.) However, the individual could never climb ladders, ropes or scaffolds, and must avoid concentrative exposure to hazards, including machinery and heights. (R. at 66.) Finally, the individual would be limited to simple and repetitive tasks with a specific vocational

40

preparation code of no more than two in a non-production oriented work setting, with no public interaction and limited interaction with co-workers and supervisors. (R. at 66.) The VE responded that an individual with such limitations could work as a marker, with 141,000 jobs available nationally, a non-governmental mail clerk, with 128,000 jobs available nationally, or a conveyor line bakery worker, with 57,500 jobs available nationally. (R. at 67.)

As explained above, substantial evidence supports the ALJ's RFC determination. Further, beyond inquiring about an individual limited to simple and repetitive tasks, the ALJ's hypothetical included that the individual would be in a non-production oriented work setting with no public interaction and limited interaction with co-workers and supervisors. (R. at 66.) Because the ALJ's hypothetical included a non-production work environment restriction, the ALJ's hypothetical and corresponding RFC determination appropriately considered Plaintiff's moderate limitations in concentration, persistence and pace. And because the hypothetical posed to the VE included all of Plaintiff's limitations described in the RFC, the ALJ was entitled to rely on the VE's testimony at step five. Accordingly, the ALJ did not err.

F. The ALJ did not err in evaluating new evidence presented before the Appeals Council.

Finally, Plaintiff argues that remand is warranted based on new evidence presented to the Appeals Council. (Pl.'s Mem. at 24-25.) Specifically, Plaintiff claims that the Appeals Council erred by not providing an explanation as to why the opinions of Dr. Bloem did not alter the decision of the ALJ. (Pl.'s Mem. at 24-25.) Defendant maintains that new evidence before the Appeals Council does not warrant remand, because the evidence is not new or material and does not relate to the period before the ALJ's decision. (Def.'s mem. at 26-28.)

41

In determining whether the ALJ's decision was supported by substantial evidence, a district court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *U.S. v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1970)) (noting that reviewing courts are restricted to the administrative record in determining whether the decision is supported by substantial evidence).

Although the Court cannot consider evidence that was not presented to the ALJ, the Act provides that the Court may remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing." *Id.* The second is a "sentence six" remand, which provides that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*; *see also Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (a reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence). Because

42

Plaintiff has offered new evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

Before denying Plaintiff's request for review on May 13, 2014, the Appeals Council considered the medical examination and opinion of Dr. Bloem. (R. at 2.) On July 25, 2012, Dr. Bloem examined Plaintiff and completed a Multiple Impairment Questionnaire, more than four months after the ALJ made her determination. (R. at 27, 768-79.) Dr. Bloem noted muscle atrophy of the left quadriceps when Plaintiff sat down. (R. at 770.) Dr. Bloem also noted that Plaintiff had difficulty walking and used a cane for assistance. (R. at 770.) Dr. Bloem reviewed Plaintiff's September 2011 MRI. (R. at 770.) He noted bulging, but no definitive herniation in the lumbar spine, and mild lateral recess stenosis at L4-L5. Dr. Bloem also reviewed Plaintiff's October 2012 MIR and found multiple-level DDD and osteophytes in Plaintiff's neck. (R. at 770.)

Plaintiff meets the third and fourth requirements of the *Borders* standard for a sentence six remand. 777 F.2d at 955. There is good cause for Plaintiff's failure to submit the evidence earlier simply because Dr. Bloem saw Plaintiff, examined her MRIs and completed a Multiple Impairment Questionnaire after the ALJ's decision. (R. at 27, 768-79.) Plaintiff has also made a general showing of the nature of the new evidence, as notes from Dr. Bloem's visit and his completed Multiple Impairment Questionnaire are included in the record. (R. at 768-79.)

However, Dr. Bloem's opinions do not meet the requirements that the new evidence be relevant and material to justify a sentence six remand. 777 F.2d at 955. New evidence must relate to the determination of disability *at the time the application was first filed*, and it must not

43

concern evidence of a later-acquired disability, or of the "subsequent deterioration of the previously non-disabling condition." *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3rd Cir. 1984) (citing *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982)); *see also Borders*, 777 F.2d at 955. New evidence must not be duplicative or cumulative. *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011); *Wilkins v. Sec'y of Health and Human Serv.*, 953 F.2d 93, 96 (4th Cir. 1991); *Nichols v. Colvin*, 2015 WL 118594, at *23 (E.D.Va. Mar. 13, 2015). Evidence must also be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted).

While Dr. Bloem's physical examination addresses Plaintiff's muscle atrophy, his notes do not indicate how Plaintiff's condition affected her prior to the ALJ's decision. (R. at 770.) Rather, Dr. Bloem's notes address possible "subsequent deterioration of the previously non-disabling condition," *Szubak*, 745 F.2d at 833, because he examined Plaintiff after the ALJ issued her written decision. Since the new evidence concerning Plaintiff's muscle atrophy does not relate to the determination of disability at the time the application was first filed, it cannot be considered relevant or material.

Further, Dr. Bloem's findings regarding Plaintiff's previous MRIs, limited range of spinal motion and ability to ambulate are duplicative of medical records that were already presented and considered by the ALJ. Dr. Saleeby and Dr. Ward observed several instances where Plaintiff demonstrated a limited range of spinal motion. (R. at 504, 506, 524, 736.) Both physicians also

44

noted on several occasions that Plaintiff walked with an antalgic gait or used a cane for assistance. (R. at 506, 557, 575, 736-37.)

Dr. Saleeby and Dr. Ward had already reviewed Plaintiff's September 2011 and October 2012 MRIs, and their findings were available to the ALJ. On September 13, 2011, Dr. Saleeby reviewed Plaintiff's MRI of the lumbar spine, finding that mild asymmetric disc bulge left paracentrally and mild stenosis of left lateral recess. (R. at 559.) At L4-L5, Dr. Saleeby also found mild central stenosis, mild left lateral stenosis and mild to moderate right lateral stenosis. (R. at 559.) On October 24, 2012, Dr. Ward reviewed an MRI of Plaintiff's cervical spine, finding osteophytosis at C3-C4 and C4-C5. (R. at 689.) He also observed mild DDD at C2-C3, moderate DDD at C3-C4, moderate to severe DDD at C4-C5, moderate DDD at C5-C6 and mild DDD at C7-T1. (R. at 690.) Because Dr. Bloem's opinions are duplicative of evidence previously considered by the ALJ, it is improbable that the ALJ's decision might have reasonably been altered with the consideration of Dr. Bloem's single examination. Therefore, Dr. Bloem's opinion cannot be considered new or material. Thus, the new evidence fails to meet the requirements for a sentence six remand.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment or in the Alternative, Motion for Remand be DENIED (ECF No. 7), that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after beings served with a copy of the this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/ _____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: AVOVST 28, 2015

46